*910 TEXTO COMPLETO DE LA RESOLUCIÓN
Acude ante nos mediante escrito de revisión el señor Juan Ferrer Dávila (en adelante el señor Ferrer o el recurrente) y solicita que revisemos la Resolución emitida por el Secretario del Departamento de Recursos Naturales y Ambientales (en adelante DRNA), Javier Vélez Arocho el 29 de marzo de 2006 archivada en autos el 3 de abril de 2006. Mediante dicha resolución se declaró no ha. lugar la reconsideración presentada por el recurrente y se confirmó la Resolución emitida el 23 de febrero de 2006, notificada el 27 de febrero de 2006. En ésta, el DRNA ordenó la remoción de una estructura ubicada en el Barrio Puerto Real de Cabo Rojo, Puerto Rico, en el término de 30 días.
Analizados los escritos de las partes, la totalidad del expediente, así como el derecho aplicable, se revoca la resolución recurrida.
I
El 23 de mayo de 1996, el recurrente y su esposa, la señora Agnes Auffant Meléndez, adquirieron mediante compraventa una estructura dedicada a residencia ubicada en el Poblado de Puerto Real, en el Barrio Miradero del Municipio de Cabo Rojo. El 30 de marzo de 1998, el DRNA aprobó la ubicación de un muelle público en la residencia del recurrente. La construcción y mantenimiento de dicho muelle fue para el beneficio de la comunidad pesquera de Puerto Real. Por el pasar del tiempo y los daños sufridos por el Huracán Georges, la estructura requiere de varias reparaciones incluyendo el techo.
Por esta razón, el 26 de febrero de 2002, el señor Ferrer presentó en el DRNA una Solicitud de Autorización o Concesión para el Aprovechamiento de las Aguas Territoriales, los Terrenos Sumergidos y la Zona Marítimo-Terrestre (en adelante solicitud de concesión). En el apartado correspondiente, el recurrente indicó: “Residencia en la cual el techo necesita repararse lo ante posible, pues amenaza con desplomarse debido al deterioro causado por la polilla y el comején.” Igualmente, sobre las medidas que se implementarán para evitar la contaminación de las aguas y fondos marinos, se indicó: “Todas las facilidades de descarga sanitaria están conectadas a la AAA. ” En cuanto al impacto ambiental de las reparaciones, el recurrente indicó: “Debido a que la reparación del techo será en madera y zinc, no habrá ningún impacto negativo. ”
El 7 de junio de 2002, el DRNA emitió una Denegatoria a la solicitud presentada por el recurrente. En la misma indicó que la estructura incluye una residencia de veraneo de 52’-7” x 22’-l”, marquesina techada de 52’-7” x 9’ y relleno. Además se informó que “las estructuras ubican totalmente sobre terrenos de dominio público denominados terrenos sumergidos y terrenos de la zona marítimo-terrestre.” En sus conclusiones de derecho, el DRNA indicó, entre otras cosas, lo siguiente:

“2. Al amparo de la Ley Núm. 23 se promulgó el Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos Bajo Estas y la Zona Marítimo-Terrestre.

3. La solicitud de reconstrucción propuesta está en contravención con los principios rectores y la política pública esbozada en el Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos Bajo Estas y la Zona Marítimo-Terrestre.

4. Según el Artículo 1.4.A.3 del Reglamento antes mencionado indica y cito:

‘únicamente se podrá permitir la ocupación del dominio público marítimo-terrestre por aquellas actividades o que, por su naturaleza, no puedan tener otra ubicación, salvo los casos provistos por el Artículo 7.’

*911
5. El Artículo 6. LA. 6 establece, entre otros aprovechamientos, que las unidades de vivienda y otros establecimientos residenciales serán considerados por el Departamento como usos no dependientes del agua. ”

Finalmente resolvió denegar la solicitud presentada y ordenó, en consecuencia, la eliminación de la estructura, el muelle, el relleno y los cimientos, en un lapso de 30 días calendarios contados a partir de la fecha de recibo de la denegatoria. A la luz de lo resuelto por el DRNA, el recurrente presentó una solicitud de reconsideración ante dicha agencia. En la misma señaló varios errores cometidos por la agencia y solicitó que se dejara sin efecto la Denegatoria emitida el 7 de junio de 2002. Además, que se concediera la autorización para las mejoras propuestas.
El 18 de agosto de 2003, notificada el 19 de agosto, el entonces Secretario del DRNA, Luis E. Rodríguez Rivera, emitió una Resolución declarando no ha lugar la solicitud de reconsideración presentada. En consecuencia indicó que quedaba en pleno vigor y efecto la Denegatoria emitida, excepto en lo referente al muelle. Se acogió el Informe de la Oficial Examinadora y se hizo formar parte de la Resolución. En sus conclusiones de derecho citó los mismos artículos del Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos Bajo Estas y la Zona Marítimo-Terrestre (en adelante el Reglamento 4860), citados en la Denegatoria a la concesión solicitada. Concluyó, que la solicitud presentada no era para un “uso dependiente del agua”, según la disposición 1.4. A (3). Además concluyó que no se trataba únicamente de una reparación de techo, sino de una reconstrucción completa de la estructura.
La parte recurrente solicitó Reconsideración a este dictamen arguyendo que se fundamentó en un Informe Técnico que se incluyó en el expediente luego de celebrada la vista adjudicativa. Dicha solicitud de reconsideración fue acogida por el oficial examinador. Luego de varios trámites, el 20 de noviembre de 2003, las partes presentaron ante el DRNA una Solicitud de Desistimiento Voluntario Sin Perjuicio. En la misma se resumieron los hechos del caso, se establecieron unos acuerdos llegados entre las partes y se incluyó la solicitud de desistimiento voluntario sin perjuicio.
A estos efectos, el 30 de enero de 2004 se rindió al Secretario del DRNA un Informe del Oficial Examinador. En el mismo se indicó que “tras estudiar rigurosamente las normas aplicables y el expediente del caso en su totalidad, somos de la opinión que este caso particular puede devolverse al área técnica para que se tramite como una solicitud de concesión. En el presente expediente obra evidencia, particularmente declaraciones juradas de pescadores del área, en donde se expresa que éstos utilizan las facilidades del recurrente para fines comunitarios de pesca. Preservar el bienestar general de una comunidad pesquera ciertamente abona al interés público." El Oficial Examinador recomendó favorablemente la estipulación propuesta, indicando específicamente que “la misma no choca con la política pública de protección del interés general dispuesta en los estatutos que administramos.” Finalmente indicó que “el área técnica podrá evaluar este caso como una concesión de aprovechamiento existente bajo los artículos reglamentarios aplicables, que entendemos comienzan con el Art. 7 del Reglamento 4860. ”
El 2 de febrero de 2004, notificada el 5 de febrero de 2004, el entonces Secretario del DRNA Luis E. Rodríguez Rivera emitió su Resolución. En la misma acogió favorablemente el Informe rendido por el Oficial Examinador, haciéndolo formar parte de la misma. En consecuencia, acogió la estipulación entre las partes y ordenó que se dejaran sin efecto las órdenes emitidas contra el recurrente. Además, ordenó al recurrente a presentar una nueva solicitud de concesión. Entre otras cosas también ordenó que se diera de baja el expediente adjudicativo, “pues el presente caso cuasi-judicial ha finalizado por vía de estipulación entre el DRNA y el recurrente. ” También se indicó que “el área técnica de Consultas y Endosos evaluará la solicitud de concesión que el recurrente presentará y procederá a evaluarla y concederla o denegarla según los criterios legales y reglamentarios aplicables, incluyendo las consideraciones de carácter e interés público descritas en la Resolución. ”
*912 Así las cosas, el 19 de febrero de 2004, el señor Ferrer, en cumplimiento con lo acordado, presentó ante el DRNA una nueva solicitud de concesión. En ésta, el recurrente señaló que el aprovechamiento responde al interés público e indicó lo siguiente: “Además del uso residencial, el aprovechamiento solicitado será utilizado por pescadores bonafi.de que realizan la actividad de la pesca en el poblado.” Incluyó junto a su solicitud, entre otras cosas, un “memorial explicativo”, varias fotografías del área, un mapa de la localización de la estructura, permisos de ARPE, la escritura de compraventa de la propiedad, un croquis de la residencia y declaraciones juradas de varios pescadores del área.
El 15 de agosto de 2005, el DRNA emitió otra Denegatoria a la solicitud de concesión sometida por el señor Ferrer. Entre las determinaciones de hechos se indicó que “la estructura bajo evaluación es una no dependiente del agua, según el Reglamento antes mencionado. ” Por otro lado, en sus conclusiones de derecho, el DRNA indicó lo siguiente:

“2. Al amparo de la Ley Núm. 23 se promulgó el Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos Bajo Estas y la Zona Marítimo-Terrestre.

3. La solicitud de reconstrucción propuesta está en contravención con los principios rectores y la política pública esbozada en el Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos Bajo Estas y la Zona Marítimo-Terrestre.

4. Según el Artículo 1.4.A.3 de Reglamento antes mencionado indica y cito:

“únicamente se podrá permitir la ocupación del dominio público marítimo terrestre por aquellas actividades o que, por su naturaleza, no puedan tener otra ubicación, salvo los casos provistos por el Artículo 7.”

5. El Artículo 6.1.A.6 establece, entre otros aprovechamientos, que las unidades de vivienda y otros establecimientos residenciales serán considerados por el Departamento como usos no dependientes del agua.

6. El Artículo 4.3 del Reglamento antes mencionado establece lo siguiente:

“ninguna persona hará reparación o ampliación alguna de una construcción en bienes del dominio público marítimo-terrestre sin una concesión previamente otorgada por el Secretario. ”

6. [sic] El Artículo 5.4.A.1 del Reglamento antes mencionado dispone lo siguiente:

“La evaluación de toda solicitud para el otorgamiento de una autorización o concesión se hará tomando en cuenta los principios rectores identificados en la Sección 1.4 y las consecuencias adicionales que a continuación se indican. A. Interés Público afectado... ”.

Además, se aplicó el Artículo 5.4.A.2 (a) y (c) del Reglamento. El mismo establece los factores generales que serán considerados al evaluar cada solicitud. Finalmente se indicó que “esta solicitud de reconsideración ha sido examinada y analizada por este Departamento a la luz de la información suministrada por el proponente, de las dispocisiones de leyes y reglamentos vigentes, y del resultado del estudio desde el punto de vista ambiental.” En consecuencia, se denegó la solicitud presentada y se ordenó a eliminar la estructura y los cimientos en un término de 30 días.
Inconforme con esta determinación, el 7 de septiembre de 2005, el recurrente presentó ante el DRNA una Solicitud Urgente de Reconsideración. En esencia indicó que el DRNA no cumplió con lo acordado en la Solicitud de Desistimiento Voluntario suscrita entre el recurrente y la representación legal del interés público, la *913 cual constituía una transacción entre las partes. Además estableció que tanto el Oficial Examinador como el entonces Secretario del DRNA habían recomendado que se aprobase la concesión solicitada, dado el beneficio que se brindaba a la comunidad pesquera de Puerto Real. Se indicó que el permiso solicitado no chocaba con la política pública de protección de interés general dispuesta en los estatutos de la agencia.
Por otro lado, el recurrente alegó que se había violado su derecho constitucional al debido proceso de ley y la igual protección de las leyes. Argüyó que “el debido proceso de ley le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y propiedad del individuo se haga a través de un procedimiento justo y equitativo. ” Añadió que “las actuaciones en el presente caso demuestran un patrón que podría representar una situación de acción selectiva contra el recurrente que obviamente menoscaban sus derechos y son contrarios a los preceptos más elementales del debido proceso de ley. ” Finalmente solicitó que se dejara sin efecto la denegatoria emitida el 15 de agosto de 2005 y se aprobara la solicitud de concesión y reparación presentada. Esta solicitud de reconsideración fue acogida por el DRNA.
El 10 de octubre de 2005, el DRNA emitió una notificación señalando una vista administrativa para el 18 de enero de 2006. Se indicó que el “propósito de la vista es determinar si la determinación recurrida fue ilegal, irrazonable o constituyó un abuso de discreción. Corresponde a la parte recurrente establecer por preponderancia de prueba las razones que justifican alterar la denegatoria recurrida.” Luego de varios trámites procesales, se llevó a cabo la vista en el día señalado.
El 16 de febrero de 2006, el Oficial Examinador Aniano Rivera Torres sometió al Secretario del DRNA su Informe. En el mismo hizo un recuento de lo sucedido en el caso desde la presentación de la primera solicitud de concesión en el año 2002. Incluyó los acuerdos llegados entre el recurrente y la representación legal del interés público en la Solicitud de Desistimiento Voluntario Sin Perjuicio presentada ante el DRNA. El Oficial Examinador indicó que durante la vista, “la parte recurrente no aportó prueba alguna en apoyo de las alegaciones contenidas en el escrito de impugnación interpuesto. El Lie. Jiménez Calderín únicamente se limitó a argumentar que el DRNA incumplió el acuerdo transaccional, ya que no evaluó la solicitud de concesión a tenor con el Artículo 7 del Reglamento 4860 del 29 de diciembre de 1992...En consecuencia, sostuvo procedía devolver la solicitud para que se evaluara nuevamente por el área técnica conforme a los criterios antes indicados. ”
Además estableció que no existía duda en cuanto al acuerdo transaccional entre las partes, pero que de ninguna manera se pactó lo que sostiene el recurrente respecto a que era “jurídicamente” merecedor de una concesión para la reparación de su estructura. Añadió que “las partes reconocieron que la estructura en controversia era pre-existente a la promulgación del Reglamento 4860 y que por lo tanto debía evaluarse según lo dispuesto por el Artículo 7 del mismo Reglamento. También reconocieron que las solicitudes al amparo del Artículo 7 se evalúan conforme a los criterios establecidos en el Artículo 5. Por último, las partes reconocieron y pactaron que la determinación de cuáles requisitos de los establecidos en el Artículo 5 aplican a esta situación particular corresponde al área programática del DRNA, la cual evidentemente es quien tiene la pericia en cuanto a este asunto.”
Por otro lado, indicó que durante la vista administrativa el recurrente no expuso un análisis que llevara a concluir que la evaluación hecha fue incorrecta. Se estableció que en la vista administrativa nunca se presentaron fundamentos para apoyar las alegaciones presentadas. Expresó el Oficial Examinador que el “área técnica del DRNA hizo exactamente lo que se acordó en la estipulación, esto es, evaluar la solicitud utilizando los criterios del Artículo 5 que en su pericia entendieran aplicables a la situación específica del caso. La parte recurrente no puede cuestionar la determinación en cuanto a cuáles eran los criterios aplicables, toda vez que en el acuerdo transaccional le reconoció al área técnica la facultad de determinar cuáles eran los aplicables.”
En cuanto a las alegaciones referentes a violaciones de derechos constitucionales, el Oficial Examinador *914 concluyó que no había nada que disponer. Concluyó que “durante la vista administrativa, dichas alegaciones no fueron objeto de discusión o argumentación, mucho menos se aportó prueba a su favor. De esta forma, la parte recurrente renunció a tales alegaciones.” Señalo ademas que el procedimiento adjudicativo previo entre las partes había finalizado mediante estipulación. Al estipular, la parte recurrente renunció a que toda la prueba aportada durante la vista se considerara para adjudicar el caso. Así, la controversia existente entre las partes, por decisión de la parte recurrente, tanto en el procedimiento anterior como en éste, siempre ha sido adjudicada sin considerar prueba alguna.” Finalmente indicó que “la parte recurrente incumplió con su obligación de establecer que tal Denegatoria era irrazonable, contraria a derecho o constituía un abuso de discreción” Recomendó que se declarara sin lugar el recurso interpuesto por el recurrente.
El 23 de febrero de 2006, notificada el 27 de febrero, el Secretario del DRNA Javier Vélez Arocho emitió la resolución recurrida. En la misma acogió favorablemente los planteamientos esbozados por el Oficial Examinador en su Informe. En consecuencia declaró sin lugar el recurso presentado por el recurrente y sostuvo en todos sus extremos la Denegatoria emitida. Ordenó al recurrente a remover la estructura así como sus cimientos en un término de 30 días.
Inconforme con la resolución emitida, el 15 de marzo de 2006, el recurrente presentó ante el DRNA una moción de reconsideración. En esencia argumentó que desde septiembre de 2002 cuando se celebró la primera vista administrativa en el caso, había presentado prueba documental, testifical y pericial ante la agencia. Argüyó que no procedía que el caso se viera como uno separado al presentado en el 2002 y que erró la agencia al no tomar en consideración la evidencia ya presentada. Indicó que no era prudente tener que presentar toda la evidencia, cuando ya se había presentado previamente ante la agencia. Indicó que tanto el Oficial Examinador como el Secretario venían obligados a considerar la prueba y que no se podía tratar el caso como uno dividido (antes de la transacción y posterior a la transacción). Alegó que “nos parece en este particular, que la apreciación de la agencia fue errónea al no tomar en consideración el expediente del caso como un todo y aseverar que la parte recurrente no aportó prueba alguna en apoyo de las alegaciones.”
El recurrente resumió los derechos del cual advino acreedor a través del acuerdo suscrito entre las partes. También alegó que tanto en el preámbulo de la denegatoria como en las determinaciones de hechos, el DRNA consideró exclusivamente la radicación de la solicitud de febrero de 2002 (ZMT-2002-004) y no la nueva solicitud de concesión posterior al acuerdo radicada en febrero de 2004. (0-BD-CZMM01-SJ-00014-15112004).
Por otro lado alegó que se le aplicó a la nueva solicitud de concesión el Artículo 1.4.A.3, cuando se había acordado que este artículo no se aplicaría a la solicitud del recurrente. Argüyó que el DRNA aplicó los criterios erróneos a la solicitud de concesión radicada el 19 de febrero de 2004. Además alegó que, conforme a lo acordado, la nueva solicitud de concesión se evaluaría a la luz del Artículo 7 del Reglamento 4860. Indicó que de los incisos 4, 5 y 6 de la Denegatoria se desprende que se le aplicaron otros criterios contenidos en los artículos 1.4.A.3; 6.1.A.6 y 4.3 del Reglamento 4860. Argüyó que, por virtud de la transacción acordada, estos artículos eran inaplicables al presente caso. Igualmente estableció que los criterios utilizados bajo el Artículo 5 del Reglamento 4860 fueron el Artículo 5.4.A. 1 y 5.4.A.2 aisladamente y no como un complemento de los otros incisos bajo el Artículo 5.
En cuanto a las violaciones a derechos constitucionales, el recurrente indicó que nunca hizo una renuncia expresa a las alegaciones levantadas en su solicitud urgente de reconsideración. Alegó que el DRNA tenía que evaluarlas a la luz de que “era parte del expediente del caso y estaba el asunto planteado ante la agencia mediante la moción de reconsideración urgente presentada. ”
El 29 de marzo de 2006, el Secretario del DRNA emitió Resolución declarando no ha lugar la moción de reconsideración. Indicó que en ésta, el recurrente pretende traer los argumentos que no expuso durante la vista *915 en su fondo. Indicó que incluso el recurrente pretendió someter prueba que no aportó durante la vista, “tal es el caso de la fotografía que aneja al escrito de reconsideración. ” Estableció que durante la vista celebrada el 18 de enero de 2006, “el recurrente no aportó prueba alguna a su favor de las alegaciones contenidas en el escrito del recurso...durante la vista no se indicó las razones que hacen necesario concluir que la solicitud no se evaluó tal y como se pactó. No se expuso análisis alguno que sugiriera o moviera al funcionario adjudicativo a concluir que la evaluación fue incorrecta. Un error señalado y no discutido equivale a no presentado. ”
Por otro lado, indicó que es incorrecta la pretensión del recurrente en cuanto a que se considere la prueba aportada en la vista celebrada en el primer procedimiento adjudicativo. Según estableció el DRNA, la prueba aportada durante la primera vista administrativa no se podía utilizar en la segunda vista, pues se trata de dos casos adjudicativos distintos.
El 27 de abril de 2006, el recurrente presentó ante este Tribunal su recurso de revisión cuestionando la resolución emitida por el DRNA. Por su parte, el DRNA, a través de la Oficina del Procurador General, presentó su alegato en oposición.
II
El recurrente señaló que el DRNA cometió los siguientes cuatro errores:

“a) Erró el Honorable Secretario del DRNA al tomar aisladamente la última vista del presente caso (10 de enero de 2006) para decir que en la misma no se aportó prueba alguna en apoyo de las alegaciones contenidas en el escrito de impugnación y solicitud urgente de Reconsideración y en consecuencia confirmar la denegatoria de la agencia a la solicitud de autorización o concesión para el aprovechamiento de las aguas territoriales, los terrenos sumergidos y la zona marítimo-terrestre, sin tomar en consideración la totalidad de los expediente y documentos presentados ante la agencia. Así también como el no considerar todos los casos del recurrente sobre la impugnación aludida como un todo y tratando el caso del recurrente como un caso diferente entre los que se habían dilucidado antes de radicada la Solicitud de Desistimiento Voluntario y después de la misma, sin apoyar su decisión en la evidencia sustancial del caso a base de la totalidad del récord.

b) Erró el Honorable Secretario del DRNA al no considerar los méritos de la concesión solicitada y denegada, a la luz de los derechos adquiridos por Juan Ferrer Dávila conforme al acuerdo entre las partes, evidenciando de esta forma una contradicción entre la solicitud de desistimiento voluntario y la Denegatoria del 15 de agosto de 2005.

c) Erró el Honorable Secretario del DRNA al no considerar que se habían violado los derechos constitucionales del recurrente a la luz de la Denegatoria emitida el 15 de agosto de 2005 y señalar que en la última vista se renunció a dicho derecho y argumentos.

d) Erró el Honorable Secretario del DRNA al no considerar el área donde está la propiedad del recurrente a la luz de la realidad del lugar. ”

III
El Artículo 1709 del Código Civil de Puerto Rico, 31 L.P.R.A. secc. 4821, establece la definición del contrato de transacción. “La transacción es un contrato por el cual las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen término al que había comenzado. ” En dicho artículo, este negocio se define como aquel acuerdo mediante el cual las partes, dando, prometiendo o reteniendo cada una alguna cosa, evitan la provocación de un pleito o ponen fin a uno ya comenzado, con el propósito de evitar los pesares que conllevaría un litigio. López Tristani v. Maldonado Carrero, 168 D.P.R. _; 2006 J.T.S. 152; Rivera Rodríguez v. Rivera Reyes, 168 D.P.R._, 2006 J.T.S. 112. Igaravidez v. Ricci, *916 147 D.P.R. 1, 5 (1988). La estipulación por la cual los litigantes dando, prometiendo o reteniendo cada uno alguna cosa, ponen término a un pleito ya comenzado, constituye un contrato de transacción. Canino v. Ballaflores, 78 D.P.R. 778 (1955).
Los elementos esenciales a este tipo de contrato son: (1) una relación jurídica litigiosa, (2) la intención de los contratantes de componer el litigio, es decir, de eliminar las controversias, y (3) las recíprocas concesiones de las partes. López Tristani v. Maldonado Carrero, supra; Ñeca Mortg. Corp. v. A. & W. Dev. S.E., 137 D.P.R. 860, 870 (1994). Existen dos clases de contratos de transacción: el judicial y el extrajudicial. Si, antes de comenzar un pleito, las partes acuerdan eliminar la controversia mediante un acuerdo, nos encontramos ante un contrato de transacción extrajudicial. Aunque puede ocurrir que, estando aún el pleito pendiente, las partes acuerden una transacción sin la intervención judicial. Neca Mortg. Corp. v. A. & W. Dev. S.E., supra.
El Tribunal Supremo ha resuelto que una estipulación suscrita por las partes y aceptada por el tribunal, que finaliza un pleito, constituye un contrato de transacción que las obliga. Neca Mortgage Corp. v. A&W Dev. S.E., supra. Tras la aprobación de la estipulación por el tribunal, ésta constituye un contrato de transacción que obliga a las partes, claro está, si están presentes los requisitos esenciales del contrato de transacción, es decir, si existe una relación jurídica incierta y las partes se hacen concesiones recíprocas. Andrés Ramos Rivera v. Estado Libre Asociado De P.R. y otros, 148 D.P.R. 118 (1999).
En virtud de estas normas generales, no deberán entenderse comprendidos en el contrato de transacción cosas distintas y casos diferentes de aquéllos sobre los que las partes se propusieron contratar. Está claro, pues, que la eficacia del contrato de transacción no puede alcanzar a otros objetos que no surjan expresamente de su contenido. Blas Toledo v. Hospital Nuestra Señora de Guadalupe, supra; Art. 1235 del Código Civil de Puerto Rico, 31 L.P.R.A. secc. 3473. Igualmente, se estará al sentido literal de los términos de la transacción, si éstos son claros. Art. 1233 del Código Civil de Puerto Rico, 31 L.P.R.A. secc. 3471. Por último, para juzgar la intención de las partes, se debe atender principalmente a los actos de éstos, anteriores, coetáneos y posteriores al contrato, así como a cualquier otra circunstancia indicativa de sus voluntades. Blas Toledo v. Hospital Nuestra Señora de Guadalupe, supra; Art. 1234 del Código Civil; Merle v. West Bend Co., 97 D.P.R. 403 (1969).
Por otro lado, es norma reiterada en nuestra jurisdicción que las decisiones de las agencias administrativas gozarán de gran deferencia. Las decisiones administrativas gozan de una presunción de regularidad y corrección; la intervención de los tribunales con las mismas está limitada por la ley y la jurisprudencia. Misión Industrial de Puerto Rico v. Junta de Planificación, 146 D.P.R. 134 (1998); Henríquez v. C.E.S,, 120 D.P.R. 194 (1987); M & B.S. v. Departamento, 118 D.P.R. 317, 331 (1987). A la luz de lo anterior, el ejercicio de nuestra función revisora está limitado a determinar si la agencia actuó arbitraria, ilegal o tan irrazonablemente que su actuación constituyó un abuso de discreción. Misión Industrial v. Junta de Planificación, supra; Reyes Salcedo v. Policía de Puerto Rico, 143 D.P.R. 85 (1997); Fuertes v. A.R.P.E, 134 D.P.R. 947 (1993).
En el caso Félix Ramírez Ferrer v. Policía de Puerto Rico, 158 D.P.R. _; 2003 JTS 3, el Tribunal Supremo de Puerto Rico estableció que: “De ordinario, la discreción administrativa es amplia y debe ser respetada por los tribunales. No obstante, para que una determinación emitida por una agencia administrativa pueda merecer deferencia por parte nuestra, ésta debe ejercerse razonablemente y de conformidad con los objetivos del estatuto.” La deferencia reconocida no equivale a la renuncia de la función revisora del tribunal en instancias apropiadas y meritorias, como resulta ser cuando el organismo administrativo ha errado en la aplicación de la ley. Reyes Salcedo v. Policía de Puerto Rico, supra; Rodríguez v. Comisión Industrial, 99 D.P.R. 368 (1970). La deferencia al “expertise” administrativo debe ceder cuando nos enfrentemos a una actuación irrazonable o ilegal. Asoc. Vec. del Hospital San Jorge v. United Medical Corp., 150 D.P.R. 70 (2000).
La Ley de Procedimiento Administrativo Uniforme (LPAU), 3 L.P.R.A §2101 et seq., establece que las decisiones que emite una agencia administrativa tienen que estar fundamentadas en el expediente y estar *917 sostenidas por evidencia sustancial. El ámbito de nuestra intervención se delimita por la sección 4.5 de la LPAU, 3 L.P.R.A. 2175, que establece en lo pertinente: “Las determinaciones de hechos de las decisiones administrativas serán sostenidas por el tribunal si se basan en evidencia sustancial que obre en el expediente administrativo. Las conclusiones de derecho serán revisables en todos sus aspectos por el tribunal.”
IV
El señor Ferrer indica en su primer y segundo señalamiento de error que el DRNA incidió al no considerar los méritos de la solicitud de concesión para el aprovechamiento de las aguas territoriales, los terrenos sumergidos y la zona marítimo-terrestre, sobre los cuales ubica la estructura a repararse. Esta solicitud fue presentada el 19 de febrero de 2004 a la luz de los acuerdos llegados por las partes en la Solicitud de Desistimiento Voluntario Sin Perjuicio. Igualmente señala que sus casos deben ser tratados como un todo y que no deben considerarse separadamente. Tiene razón.
Cuando el 20 de noviembre de 2003, las partes presentaron ante el DRNA la solicitud de desistimiento, acordaron, entre otros asuntos, que el recurrente presentaría una segunda solicitud de concesión para el aprovechamiento de la zona marítimo-terrestre que sería evaluada bajo los criterios allí acordados. Entre los acuerdos recogidos en la referida solicitud de desistimiento se reconoció que la estructura del señor Ferrer fue construida antes del año 1992, previo a entrar en vigor el Reglamento 4860. Por ello, la nueva solicitud se consideraría como un aprovechamiento existente al momento de entrar en vigor el referido Reglamento. Como consecuencia se acordó que en este caso no es aplicable el principio rector dispuesto en el Reglamento 4860, de que solo se puede permitir la ocupación del dominio público marítimo-terrestre a aquellas instalaciones que sean dependientes del agua. Este principio esta contenido en el Artículo 1.4 (A)(3).
Las partes coincidieron en que la presentación de esta segunda solicitud de concesión era necesaria previo a que se otorgara la autorización para realizar reparaciones a la estructura objeto del procedimiento (la primera solicitud). Como vimos, esta solicitud de autorización para reparar fue originalmente sometida el 21 de febrero de 2002, y se identificó con el número ZMT-2002-004. Las partes acordaron que se paralizará o dejará sin efecto cualquier orden emitida por el DRNA contra el recurrente, para darle la oportunidad de presentar la segunda solicitud de concesión. Luego de esta presentación, que ocurrió el 19 de febrero de 2004, el área programática del DRNA debería continuar evaluando ambas solicitudes de manera simultánea para evitar la fragmentación del trámite administrativo. 
La solicitud de concesión presentada el 19 de febrero de 2004, fue identificada con el número 0-BD-C2M01-SJ-00014-15112004. Según pactado, la misma había de ser evaluada a la luz de los artículos 7 y 5 del Reglamento 4860. Ello así, debido a que el Artículo 7 provee para el otorgamiento de concesiones para los aprovechamientos y construcciones existentes. De otro lado, el Artículo 5 establece los requisitos de contenido y los criterios de evaluación para este tipo de solicitud. Las partes consignaron en el acuerdo que los requisitos aplicables para el otorgamiento de concesiones va a variar de acuerdo a si el aprovechamiento es uno nuevo o es uno existente. Corresponde al área programática del DRNA evaluar cuáles requisitos aplican a cada situación.
El 15 de agosto de 2005, el DRNA emitió una nueva denegatoria. En el párrafo titulado descripción de solicitud la misma está identificada con los números 0-BD-C2M01-SJ-00014-15112004/ZMT-2002-00, correspondientes a las dos solicitudes presentadas por el señor Ferrer. Sin embargo, de las determinaciones de hechos surge lo siguiente: “1. Mediante la radicación número ZMT-20022-004 del 26 de febrero de 2002, se solicita la reparación de estructura para: a. uso vacacional”. En la quinta y última determinación de hecho se indica: “5. La estructura bajo evaluación es una no dependiente del agua, según el Reglamento antes mencionado”. Las demás determinaciones de hecho están relacionadas con la solicitud de reparación que fue originalmente identificada con el número ZMT-2002-004.
De las conclusiones de derecho contenidas en la referida denegatoria, encontramos que el DRNA aplicó el *918 Artículo 1.4 (A)(3), conjuntamente con el 6.1 (A)(6) para fundamentar en derecho la denegatoria. Estos artículos recogen el principio rector dispuesto en el Reglamento 4860, de que sólo se puede permitir en el área marítimo-terrestre instalaciones que sean dependientes de agua, precisamente el principio que, en el acuerdo sometido, se estipuló que no era aplicable al caso del señor Ferrer. Nada en dicha denegatoria hace referencia al aprovechamiento existente que habría de evaluarse simultáneamente con la solicitud de reconstrucción, según acordado entre las partes.
Examinada esta denegatoria de 15 de agosto de 2005, tenemos que concluir que el DRNA no evaluó la segunda solicitud de concesión presentada el 19 de febrero de 2004, al amparo del acuerdo recogido entre las partes y avalado por el Secretario del DRNA, en su resolución de 2 de febrero de 2004. De una simple lectura de la misma se desprende que utiliza los mismos fundamentos en derecho para denegar que la denegatoria original emitida el 7 de junio de 2002. Si el DRNA evaluó la segunda solicitud al amparo del acuerdo, no lo discutió y consignó debidamente en su resolución. En las determinaciones de hechos se hace única referencia a la “radicación ZMT-2002-004 del 26 de febrero de 2002” donde “...se solicita reparación de estructura... ”. En ningún lugar de la misma se hace mención del aprovechamiento existente, ni se determina porqué razón, si alguna, el señor Ferrer no cualifica para la concesión a tenor con lo dispuesto en los artículos 7 y 5 del Reglamento 4860.
Nada en dicha denegatoria nos permite concluir que el DNRA consideró y dispuso de la solicitud de concesión presentada el 19 de febrero de 2004, según lo pactado. Esta debía considerarse y evaluarse simultáneamente con la solicitud de reparación presentada el 26 de febrero de 2002. La referida resolución denegatoria es tan vaga y escueta que no nos permite concluir de otra manera. Su contenido es tan general que no permite hacer un análisis de las razones o fundamentos en que se basa.
Es meritorio señalar que no está en controversia que el DRNA no venía obligado a conceder las concesiones solicitadas. En tal sentido, no es correcto lo que asevera la parte recurrente de que se convino como parte de la transacción que se aprobara el permiso. Tampoco estamos prejuzgando los méritos de dichas solicitudes. Reconocemos la pericia del DRNA para determinar si proceden o no las concesiones solicitadas. No obstante, el DNRA sí tenía la obligación de cumplir con lo acordado en la solicitud de desistimiento presentada por ambas partes y avalada por el Secretario. Como consecuencia de la referida transacción, tenía la obligación de hacer una evaluación en los méritos del caso y emitir una resolución fundamentada, conteniendo las determinaciones de hechos y conclusiones de derecho que justifiquen la decisión tomada en ambas solicitudes. La estipulación suscrita por las partes y avalada por el Secretario, constituye un contrato de transacción que los obliga. La clara intención de las partes era que se efectuara una genuina evaluación de las solicitudes presentadas, dentro del marco de los términos de la transacción. Estos términos fueron claros y presuponen la buena fe de los contratantes. Además, las partes incluyeron ciertas recomendaciones, basadas en su percepción del caso, que tenían que ser consideradas por el Secretario.
Considerada la totalidad del expediente, tenemos que concluir que la determinación recurrida emitida el 23 de febrero de 2006 por el DRNA, en la cual para todos los efectos se ratifica la denegatoria impugnada de 25 de agosto de 2005, es una arbitraria e irrazonable. La misma se limita ha efectuar un recuento de los hechos procesales de este caso y a indicar que en la vista celebrada el 18 de enero de 2006, el recurrente no aportó prueba en apoyo de su impugnación. En forma muy general indica que la solicitud se evaluó según lo pactado a tenor con el Artículo 7 y que se aplicaron los criterios del Artículo 5 que entendió el área técnica que eran aplicables. Sin embargo, no expone cómo específicamente se efectuó esa evaluación, no indica cuáles fueron los criterios aplicados y cuáles no se cumplieron. Entendemos que los primeros dos errores señalados se cometieron. Por ello se hace innecesario que entremos a discutir los demás errores señalados.
V
Por los fundamentos antes expuestos, se revoca la Resolución recurrida y se devuelve el caso al DRNA para *919 que se continúen los procedimientos de conformidad con lo aquí resuelto. La agencia deberá considerar y disponer de las dos solicitudes presentadas por el señor Torres a tenor con lo pactado. Finalmente deberá emitir su determinación, debidamente fundamentada. En ésta se deberán especificar cuáles fueron los criterios aplicados y cuáles de ellos no se cumplen.
Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.
Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones
ESCOLIOS 2007 DTA 33
1. Del Informe del Oficial Examinador se desprende respecto al muelle lo siguiente: “Analizada toda la prueba, documental, testifical y ocular, se recomienda declarar CON LUGAR la reconsideración en cuanto a la orden de eliminación del muelle, pues éste se construyó con autorización del Departamento, mediante la concesión antes citada.”
2. Artículos 1.4. A (3) y 6.1.A (6).
3. Véase Apéndice VII, página 190 del Apéndice del Recurrente.
4. Entiéndase el Reglamento 4860, Reglamento para el Aprovechamiento, Vigilancia, Conservación y Administración de las Aguas Territoriales, los Terrenos Sumergidos Bajo Estas y la Zona Marítimo-Terrestre, según enmendadas.
5. Se indicó en la solicitud original que ésta estructura tiene mas de 50 años de haberse construido.
6. Véase párrafo 2 de la Solicitud de Desistimiento Voluntario Sin Perjuicio, Apéndice VII, pág. 190.